Filed 9/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>ELNORA MYLES,<br><br>    Defendant and Appellant. | A161450<br><br>(Alameda County<br>Super. Ct. No. 150006) |

Defendant Elnora Myles appeals from the denial of her petition for resentencing pursuant to Penal Code[1] section 1170.95. After issuing an order to show cause and holding an evidentiary hearing, the trial court concluded defendant was not entitled to resentencing relief because she was not convicted under a theory of felony murder or murder under the natural and probable consequences doctrine, and because defendant was the actual killer. On appeal, defendant contends the trial court prejudicially erred by admitting and considering information contained in a parole comprehensive risk assessment report and the transcript of her parole suitability hearing because such evidence is not "new or additional evidence" within the meaning of section 1170.95, subdivision (d)(3). Alternatively, defendant contends the evidence was inadmissible because postplea admissions cannot be used to prove the elements of the crime, and because she should be entitled to use

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

immunity for statements made in connection with her parole suitability hearing. We conclude the trial court did not err, but even if it did, any error was harmless under the circumstances of this case. Accordingly, we affirm.

## I. BACKGROUND

### A. *The Murder and Defendant's Guilty Plea*[2]

Defendant reported the victim, Cedric White, missing in February 2004. At the time, defendant was living in White's home. In April, police executed a search warrant in the home. They found White's body wrapped in cellophane and entombed beneath a basement workbench, hidden behind installed particleboard. An autopsy revealed signs of blunt trauma to his head. Police also found evidence that defendant had used White's identification to open a number of credit accounts in his name, with defendant as an authorized user. Purchases on the accounts totaled over $13,000.

When defendant was questioned by police about White's whereabouts, she first indicated she had last seen him a week before, leaving in a cab with a lady friend, headed to China to celebrate the completion of his " 'Jazz history' " book. In a letter to the probation department, the prosecutor represented that during one interview with police, defendant claimed White was killed by a fall down the stairs, which occurred during an argument with defendant. Defendant told police a female boarder was in White's house at the time of the argument "but [defendant] was vague about what [the boarder] saw or did." When police interviewed the boarder, she "adamantly denied" being present.

---

[2] This brief summary of background facts is taken from our prior nonpublished opinion, *People v. Myles* (Apr. 30, 2007, A114601). Additional facts concerning the crime, primarily from the preliminary examination, are discussed below.

On May 27, 2005, an information was filed charging defendant with murder (§ 187, subd. (a)), alleging that she personally inflicted great bodily injury (§ 1203.075). Defendant was also charged with identity theft (§ 530.5, subd. (a)), forgery (§ 470, subd. (d)), and four counts of making false financial statements (§ 532a, subd. (1)).

Defendant entered a plea of no contest to second degree murder in exchange for dismissal of the other charges and the great bodily injury allegation. Her counsel stipulated to a factual basis for the plea based on the preliminary examination and discovery. After unsuccessfully seeking to withdraw her plea, defendant was sentenced to 15 years to life in prison.

Defendant appealed, and we affirmed the judgment in a nonpublished opinion, *People v. Myles*, *supra*, A114630.

**B. Defendant's Resentencing Petition**

In January 2019, defendant filed a petition for resentencing under section 1170.95, seeking to vacate her 2006 second degree murder conviction and be resentenced. The trial court appointed counsel for defendant and set a briefing schedule. The prosecution filed a formal opposition to the petition and defendant filed a reply and supplemental briefing. The trial court found the petition established a prima facie case and issued an order to show cause.

The prosecution sought to admit defendant's statements from a comprehensive risk assessment report (parole risk assessment) and parole suitability hearing (parole hearing transcript). In the statements, defendant admitted killing White and specifically stated she hit him with a metal water bottle, entombed him in his own house, took advantage of things he owned, and lied to his family. Defendant said her boyfriend and children were not in the house when she hit White and her boyfriend "didn't have a role" in the murder. Defense counsel objected to the court's consideration of the parole

3

risk assessment and parole hearing transcript, arguing the evidence was subject to use immunity, and even if it were admissible, it would be admissible only for impeachment purposes. The trial court ruled that use immunity did not apply and admitted the evidence.

At the conclusion of the section 1170.95 hearing, the trial court denied defendant's petition on two different grounds: "One, in review of the record of conviction, which includes the preliminary hearing transcript, the charges that were filed, in looking at all of that, it does not appear to me that this is a felony murder case, nor is it a case where the prosecution allegation is that [defendant] was an aider and abettor and that it was a natural and probable consequences theory of aiding and abetting. I don't find that either of those legal theories are at play in this case.

"And, [defense counsel], you've pointed to other people who could potentially be involved, but there's no indication in the police reports or the preliminary hearing that those people were involved; and, in fact, [defendant], when asked that question specifically at the parole hearing, confirmed that no one else was involved.

"So one layer is that the theories that are necessary to get relief under [section] 1170.95 are not at play in this case.

"The second basis for denying relief is I find that [defendant] is the actual killer in this case. She's not vicariously liable here. She's directly liable. And so for that reason I find that she is not entitled to relief under Section 1170.95."

Defendant timely appealed.

4

## II. DISCUSSION

### A. *New or Additional Evidence*

Defendant contends the trial court could not consider either the parole risk assessment and the parole hearing transcript at her section 1170.95 evidentiary hearing because they are not part of the record of conviction or "new or additional evidence" within the meaning of section 1170.95, subdivision (d)(3).

#### 1. *Applicable law*

Senate Bill No. 1437 (2017–2018 Reg. Sess.), effective January 1, 2019 (Senate Bill 1437), revised the felony-murder rule and natural and probable consequences doctrine in California "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); *People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).) The bill amended the definition of malice in section 188, revised the definition of the degrees of murder to address felony-murder liability in section 189, and added section 1170.95, "which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in the law would affect their previously sustained convictions." (*People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 417, citing Stats. 2018, ch. 1015, §§ 2–4.)

Section 1170.95, subdivision (a) provides that a person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court for resentencing "when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences

5

doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019."

If the trial court determines, under subdivision (c) of section 1170.95 that the defendant has made " 'a prima facie showing' " of entitlement to relief, "the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not . . . previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' " (*Lewis*, *supra*, 11 Cal.5th at p. 960.) At the evidentiary hearing, the burden of proof is on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. (§ 1170.95, subd. (d)(3).) "The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Ibid.*)

## 2. *Forfeiture*

The Attorney General contends defendant has forfeited her challenge to the admissibility of the parole risk assessment and parole hearing transcript on the basis they are not "new or additional evidence" within the meaning of section 1170.95 because she failed to object on those grounds below. We agree.

A defendant may not challenge the admissibility of evidence on appeal if he or she failed to raise a proper objection on those grounds in the trial court. (Evid. Code, § 353, subd. (a) [error in admitting evidence may not be

6

basis for reversal of judgment unless "an objection to or a motion to exclude or to strike the evidence . . . was timely made and so stated as to make clear the specific ground of the objection or motion"]; *People v. Anderson* (2001) 25 Cal.4th 543, 586 ["a challenge to the admission of evidence is not preserved for appeal unless a specific and timely objection was made below"].) "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his [or her] trial secure in the knowledge that a conviction would be reversed on appeal." ' " (*People v. Partida* (2005) 37 Cal.4th 428, 434.) Although defendant objected below that the evidence should be subject to use immunity and should be used only for impeachment, she did not object that the evidence was inadmissible under the language of section 1170.95. (See *Partida,* at p. 435 [to preserve claim on appeal, objection below must have been made on same grounds].) Accordingly, she has forfeited her right to challenge the evidence on that basis here.

Defendant urges us to conclude that any specific failure to object was not required or should be excused. She relies on several exceptions to the general rule of appellate procedure that points not raised in the trial court will not be considered on appeal. She argues that whether the parole risk assessment and parole hearing transcript are "new or additional evidence" is a question of law on undisputed facts, is an unsettled question, and presents an important legal issue for our consideration. Our general authority to exercise discretion to consider issues raised for the first time on appeal, however, is constrained by specific statutory command when the issue concerns the admission or exclusion of evidence. (Evid. Code, § 353 [judgment shall not be reversed "by reason of the erroneous admission of

7

evidence" unless timely and specific objection is made in the trial court].) Our Supreme Court clarified this principle in *People v. Williams* (1998) 17 Cal.4th 148. Discussing the rule that "[a]n appellate court is *generally* not prohibited from reaching a question that has not been preserved for review by a party," the court explained the appellate court "*is* in fact barred when the issue involves the admission (Evid. Code, § 353) or exclusion (*id.,* § 354) of evidence." (*Id.* at p. 161, fn. 6, italics added; *People v. Viray* (2005) 134 Cal.App.4th 1186, 1210.)

Even were we to review defendant's claim on the merits, however, we would reject it.

### 3. Statutory Construction

Defendant argues the parole risk assessment and parole hearing transcript do not constitute "new or additional evidence" within the meaning of section 1170.95 because the "purpose and statutory history underlying section 1170.95 demonstrates the Legislature intends the 2019 statutory provisions, including the evidentiary hearing, to be circumscribed by the original trial proceedings, and its admitted or then existing admissible evidence."

"The proper interpretation of a statute is a question of law we review de novo. [Citations.] ' " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning." ' " ' [Citation.] ' "[W]e look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must

8

harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' " ' " (*Lewis, supra,* 11 Cal.5th at p. 961.)  " 'If no ambiguity appears in the statutory language, we presume that the Legislature meant what it said, and the plain meaning of the statute controls.' " (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1123.)  "We will follow that meaning unless doing so would lead to absurd results the Legislature did not intend." (*People v. Betts* (2020) 55 Cal.App.5th 294, 298.)

Here, the plain language of the statute allows both the petitioner and the prosecutor to rely on "the record of conviction or offer *new or additional evidence* to meet their respective burdens." (§ 1170.95, subd. (d)(3), italics added.)  The term "new or additional evidence" is not defined in the statute, but the ordinary meaning of the word "new," unbounded by further definition or restriction in the statutory text, suggests the Legislature intended to allow both the prosecution and defendant to rely on evidence that becomes available after a trial or plea, whether the evidence previously existed or not. (See *People v. Williams* (2020) 57 Cal.App.5th 652, 661 (*Williams*) ["In allowing for the section 1170.95 postconviction proceeding, the Legislature gave the superior court unfettered discretion to consider 'evidence' without any restriction at the subdivision (d)(3) hearing to determine the petitioner's eligibility for resentencing."]; Couzens et al., Sentencing California Crimes (The Rutter Group 2021) § 23:51 ["[Senate Bill] 1437 does not specify the exact scope and nature of the 'new evidence' the parties may offer.  The statute appears to permit live testimony and admission of new physical evidence."].)

A construction of the statute that takes a broad view of "new or additional evidence" also comports with the purpose of the statute. (*Lewis,*

9

*supra*, 11 Cal.5th at p. 961 [courts must construe statute in light of statutory purpose].)  At the evidentiary hearing, the prosecution must prove, beyond a reasonable doubt, that the defendant is ineligible for resentencing. (§ 1170.95, subd. (d)(3).)  Given that the clear legislative intent to provide the defendant an opportunity to challenge his or her conviction retroactively under the new law and to require the prosecution to prove the defendant's ineligibility for resentencing beyond a reasonable doubt, it is a logical choice to allow both parties to locate and introduce evidence they did not have a chance to present in the original guilt proceeding.  (See, e.g., *People v. Gentile* (2020) 10 Cal.5th 830, 856 ["We agree that the Legislature authorized the parties to offer new or additional evidence during the section 1170.95 process in order to allow the parties to explore issues they did not explore under the prior state of the law.  The statute contemplates that such evidence may inform whether a conviction remains valid despite the ameliorative provisions of Senate Bill 1437."]; *People v. Lopez* (2020) 56 Cal.App.5th 936, 950, review granted Feb. 10, 2021, S265974 (*Lopez*) [in making the "ineligibility inquiry" required by § 1170.95, subd. (d)(3), "the trial court may be confronted with new evidence [citation] and frequently will be asked to find newly relevant facts not previously admitted or found by a trier of fact"]; *People v. Duchine* (2021) 60 Cal.App.5th 798, 813 ["By allowing new evidence and providing for an evidentiary hearing, the Legislature plainly intended that the issues concerning whether the defendant was guilty under theories of murder not previously or necessarily decided would be resolved anew"].)

Moreover, an understanding of "new or additional evidence" that allows parties to introduce evidence that did not previously exist makes sense given that section 1170.95 applies to convictions by plea, not just jury trials.  In light of the limited record often available in cases resolved by plea, the

provision allowing both parties to present evidence available for the first time postconviction enables them to meet their respective burdens of proof. (See, e.g., *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 239–240, review granted Mar. 10, 2021, S266652 [rejecting harmless error standard for a trial court at § 1170.95 hearing in favor of an independent fact finder standard because, "Given the limited record [in plea cases], it would be impossible to assess whether a still-valid ground for a murder conviction existed, let alone to determine beyond a reasonable doubt that the valid ground was the basis for the plea. Yet section 1170.95 contemplates the same procedure to determine eligibility in plea cases as in cases in which the murder conviction was reached at trial."].)

Defendant argues, however, that the plain meaning of "new" creates an "ambiguity or potential ambiguity" because it "can mean an unlimited variety of evidence created at any time *or* something previously in existence but recently acquired." (Italics added.) In support of her argument the statutory language means only the latter, defendant asks us to look to the legislative history of section 1170.95. Specifically, defendant contends the development of the statutory language through the legislative process shows the Legislature intended to confine "new evidence" to "the known facts and circumstances, admitted evidence and/or the then existing but non-admitted evidence" at the time of the original guilt proceedings.

The first version of Senate Bill 1437, as introduced on February 16, 2018, required the trial court, upon receipt of a petition, to "request" copies of the charging documents, the abstract of judgment, the reporter's transcript of any plea, the sentencing transcript, the verdict forms from any trial, and "[a]ny other information the court finds relevant to its decision, including information related to the charging, conviction, and sentencing of the

11

petitioner's codefendants in the trial court." (Sen. Bill No. 1437 (2017–2018 Reg. Sess.) as introduced Feb. 16, 2018, § 6.) The original version of the bill then directed the trial court to notify the prosecution and defense, request a response, and if the evidence was sufficient that the petitioner falls within the provisions of the statute, hold a hearing to determine whether the petitioner was entitled to be resentenced. (*Ibid.*)

Subsequently, the Senate amended Senate Bill 1437 to permit only the petitioner at a section 1170.95 hearing to present new or additional evidence, while still allowing the prosecution to rely only on the record of conviction. (Sen. Amend. to Sen. Bill No. 1437 (2017–2018 Reg. Sess.) May 25, 2018, § 6 ["The prosecutor may rely on the record of conviction to meet its burden, but the petitioner may offer new or additional evidence to meet the burden of going forward or in rebuttal of the prosecution's evidence."].) The bill was again amended in the Assembly on August 20, 2018. The third version of the bill added section 1170.95 and provided in subdivision (d)(3) the language enacted into law that now appears in the statute: "The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (Assem. Amend. to Sen. Bill No. 1437 (2017–2018 Reg. Sess.) Aug 20, 2018, § 4; Stats. 2018, ch. 1015, § 4, eff. Jan. 1, 2019.)

Defendant contends this progression shows the drafter's intention was to test a potentially eligible conviction based on the evidence "surrounding the original trial." She argues that intent was stated in the original version of the statute because eligibility for relief depended on evidence adduced at the original trial against the petitioner or against a codefendant in a separate trial. But in allowing evidence from the separate trial of a codefendant, the original version of the statute reflects legislative intent to allow evidence

beyond the petitioner's record of conviction. If a separate trial took place after the petitioner's conviction, for example, evidence, including testimony, introduced at the codefendant's trial may not have been "in existence" at the time of the petitioner's trial. Moreover, the originally proposed language broadly allowed the trial court to consider "[a]ny other information the court finds relevant to its decision." (Sen. Bill No. 1437 (2017–2018 Reg. Sess.) as introduced Feb. 16, 2018, § 6, ch. 16.) Such language does not reflect an intent to limit evidence to that available at the time of the petitioner's conviction.

Defendant also recognizes the second version of Senate Bill 1437, which allowed only the petitioner to offer new or additional evidence, "suggests the Legislature wanted to give the petitioner, among other things, the ability to testify at a resentencing hearing if he had chosen to exercise his Fifth Amendment right to remain silent at trial." Clearly, a defendant testifying at a section 1170.95 evidentiary hearing who had previously invoked the Fifth Amendment at trial would be offering precisely the type of "new evidence" available for the first time posttrial that defendant argues the statute does not allow. Defendant does not explain why a defendant's testimony at an evidentiary hearing would be admissible as "new" evidence, but the same defendant's testimony from a parole hearing would not be. In both cases, the defendant's testimony regarding his or her role in the crime is provided posttrial and constitutes evidence about facts and circumstances existing at the time of the crime that could have been admitted at trial.[3]

_____

[3] In her reply brief, defendant argues testimony from a parole hearing is different from live testimony offered at a section 1170.95 hearing because in the parole context, a defendant may feel pressured to admit culpability to be found suitable for parole. This argument, however, relates to fairness, and whether a defendant should be entitled to a type of use immunity, not

13

Defendant next acknowledges the Legislature "[a]pparently realiz[ed] the inequity" in the language of the second version of Senate Bill 1437 that allowed only the defendant to present new or additional evidence, and thus amended the statute to allow both parties to introduce new evidence. But defendant contends the change allowing both parties to present such evidence "did not signal the Legislature's intent to open the door to any and every piece of potential evidence, including evidence that was not available at the time of the underlying guilt proceeding, and created after the final judgment." Defendant fails to explain, however, how the amendment allowing the prosecution as well as the defense to present new or additional evidence reflects an intent to *limit* evidence to that available at the time of conviction.

Nor are we persuaded that the legislative amendments were formulated to address concerns expressed by the California District Attorneys Association (CDAA) as defendant argues. Defendant points to the fact that the CDAA opposed the original and second versions of Senate Bill 1437 in part because the bill would "require the litigation of facts previously not litigated in the original case, particularly in cases that resolved through a plea." (Sen. Com. on Pub. Safety, History and Comments on Sen. Bill No. 1437 (2017–2018 Reg. Sess.) as introduced Feb. 16, 2018, for hearing on Apr. 24, 2018, p. 10; Assem. Com. on Pub. Safety, Sen. Bill No. 1437 (2017–2018 Reg. Sess.) as amended May 25, 2018, for hearing on June 26, 2018, p. 8.) Defendant argues the Legislature "obviously took these concerns seriously, as it changed the language and ultimately enacted the legislation

---

whether such evidence is "new or additional" evidence within the meaning of section 1170.95. We address defendant's argument regarding the compulsion to admit culpability at parole hearings below.

14

in its present state." To the contrary, however, the CDAA's comment specifically argued that "by placing the burden on the prosecution to prove beyond a reasonable doubt that petitioners do not qualify for resentencing," the Bill would require litigation of facts not previously decided. (Sen. Com. on Pub. Safety, History and Comments on Sen. Bill No. 1437 (2017–2018 Reg. Sess.) as introduced Feb. 16, 2018, for hearing on Apr. 24, 2018, p. 10; Assem. Com. on Pub. Safety, Sen. Bill No. 1437 (2017–2018 Reg. Sess.) as amended May 25, 2018, for hearing on June 26, 2018, p. 8.) As discussed above, the requirement that the prosecution prove ineligibility beyond a reasonable doubt was retained in the law as enacted. (§ 1170.95, subd. (d)(3).) This fact strongly suggests the Legislature concluded that providing retroactive relief to petitioners convicted under now-invalid theories of murder was more important than the CDAA's expressed concern about avoiding new litigation.[4]

Defendant also urges us to look to other statutes that allow the introduction of "new evidence," including the statutes governing new trial motions (§ 1181) and petitions for writ of habeas corpus (§ 1473) to decipher the meaning of the phrase "new or additional evidence." Those statutes, however, contain their own definitions of "new evidence." Section 1181 allows a court to grant a motion for new trial "[w]hen new evidence is discovered material to the defendant, and which he [or she] could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. 8.) A writ of habeas corpus is available when "[n]ew evidence exists

---

[4] We likewise reject defendant's argument that allowing litigation of facts not previously decided implicates a defendant's Sixth Amendment right to have a jury determine the meaning of new evidence. (See, e.g., *People v. James* (2021) 63 Cal.App.5th 604, 608–611; *Lopez, supra*, 56 Cal.App.5th at pp. 957–958, review granted; *People v. Howard* (2020) 50 Cal.App.5th 727, 740; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156 [§ 1170.95 petitioners do not have 6th Amend. trial rights].)

that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial." (§ 1473, subd. (b)(3)(A).) The statute defines "new evidence" as "evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching." (§ 1473, subd. (b)(3)(B).) Similarly, subdivision (f) of section 1473 authorizes a petition of habeas corpus on the basis of "other new evidence that could not have been previously known by the petitioner with due diligence," and section 1473.6 allows a petitioner to move to vacate a judgment on the basis of " 'newly discovered evidence,' " defined as "evidence that could not have been discovered with reasonable diligence prior to judgment" (§ 1473.6, subds. (a) & (b)).

In these statutes, the Legislature has defined or placed limits on the introduction of "new evidence," demonstrating that it knows how to limit the admissibility of such evidence when it intends to do so. Defendant argues we should apply the same restrictions here, but there is no textual evidence of similar legislative intent in section 1170.95, subdivision (d)(3). (See, e.g., *People v. Wilson* (2020) 53 Cal.App.5th 42, 50–52 [rejecting interpretation of § 1170.95, subd. (g) that would require the court to add words to the statute that do not currently exist]; *People v. Roach* (2016) 247 Cal.App.4th 179, 185 ["Additional restrictions on a trial court's authority at resentencing could have been included in section 1170.18, but were not."]; *Vasquez v. State of California* (2008) 45 Cal.4th 243, 253 ["We may not rewrite the statute to conform to an assumed intention that does not appear in its language."].)

16

In sum, the trial court did not err in admitting and considering the parole risk assessment report and parole hearing transcript at the section 1170.95 evidentiary hearing.

## B. People v. Trujillo

Defendant next asserts the trial court erred in admitting the parole hearing exhibits because even if the evidence was admissible as "new or additional evidence" within the meaning of section 1170.95, subdivision (d)(3), it is inadmissible under *People v. Trujillo* (2006) 40 Cal.4th 165, 179 (*Trujillo*) to prove the elements of the crime.

As an initial matter, we again conclude defendant has forfeited this claim on appeal, because she failed to object on this basis in the trial court. (Evid. Code, § 353, subd. (a); *People v. Partida*, *supra*, 37 Cal.4th at p. 435.) Even considered on the merits, however, we reject her claim.

In *Trujillo*, the defendant was convicted by jury of felony assault by means of force likely to produce great bodily injury. In bifurcated proceedings, the trial court was asked to determine whether a prior conviction for inflicting corporal injury (§ 273.5, subd. (a)) qualified as a strike. (*Trujillo, supra*, 40 Cal.4th at pp. 169–170.) The prosecution argued the prior conviction qualified in part based on a probation report prepared after the defendant's plea but before sentencing in which the defendant admitted that he " 'stuck [the victim] with [a] knife.' " (*Id.* at p. 170.) Our Supreme Court held that the defendant's admission in the probation report did not necessarily reflect the nature of the crime of which he was convicted, and thus could not be used by the prosecution to establish the prior conviction was for a serious felony. (*Id.* at p. 179.)

*Trujillo* is distinguishable. In that case, the trial court considered whether a prior conviction qualified as a strike and the probation report at

issue potentially would have been used to increase the defendant's punishment. (*Trujillo, supra,* 40 Cal.4th at p. 175.) Here, section 1170.95 is an act of legislative lenity in that a defendant who qualifies for relief may receive a decreased punishment. (See, e.g., *People v. Perez* (2018) 4 Cal.5th 1055, 1063–1064 [trial court's factfinding based on new evidence regarding the petitioner's eligibility for resentencing under Prop. 36 does not implicate 6th Amend. rights because retroactive application of benefits are legislative act of lenity; "a factual finding that results in resentencing ineligibility does not increase the petitioner's sentence; it simply leaves the original sentence intact"].) Contrary to defendant's argument, the prosecution in this case was not using her postconviction admissions to " 'convict' " her, but to prove her ineligibility for a sentence reduction based on changes in the law under a retroactive statutory resentencing procedure.

Moreover, in determining whether a prior conviction qualifies as a strike—the issue under consideration in *Trujillo*—the court is limited to considering the record of conviction. (*Trujillo*, *supra*, 40 Cal.4th at p. 180; *People v. Guerrero* (1988) 44 Cal.3d 343, 355.) As the *Guerrero* court explained, the rationale for this limitation is to prevent "the prosecution from relitigating the circumstances of a crime committed years ago and thereby threatening the defendant with harm akin to double jeopardy and denial of a speedy trial." (*Guerrero*, at p. 355.) Here, however, double jeopardy principles are not at stake because defendant is voluntarily seeking to vacate her prior conviction, not subjecting herself to a new trial or the possibility of increased punishment. (See § 1170.95, subd. (d)(1) [eligible petitioners may be resentenced provided the new sentence is not greater than the initial sentence]; *People v. Hernandez* (2021) 60 Cal.App.5th 94, 111 [evidentiary hearing under § 1170.95 "does not implicate double jeopardy because

18

section 1170.95 'involves a resentencing procedure, not a new prosecution' "]; *People v. Hall* (2019) 39 Cal.App.5th 831, 838–846 [trial court could use reliable hearsay from probation and police reports in petition for resentencing under Prop. 64]; *People v. Sledge* (2017) 7 Cal.App.5th 1089, 1095 [limited use of hearsay such as that found in probation reports is permitted in Prop. 47 eligibility hearing, a type of sentencing proceeding].)

Further, in a section 1170.95 evidentiary hearing, the trial court is *not* limited to the record of conviction—rather, as discussed at length above—the parties may present "new or additional evidence." (§ 1170.95, subd. (d)(3).) Accordingly, the *Trujillo* court's reasoning does not apply here, because the Legislature clearly and expressly made provision for the court to go beyond the record of conviction to determine whether a defendant qualifies for relief based on changes in the law.

## C. Use Immunity

Next, we address defendant's argument that the trial court erred because she was entitled to a form of use immunity for her statements and testimony in connection with her suitability for parole. Defendant relies on *People v. Coleman* (1975) 13 Cal.3d 867 (*Coleman*) and its progeny to argue that statements made in a parole suitability hearing and during a risk assessment should be inadmissible as substantive evidence of guilt.

In *Coleman*, the California Supreme Court held a defendant's statement from a probation revocation proceeding could not be used against him by the prosecution to lighten its burden of proof at trial. (*Coleman*, *supra*, 13 Cal.3d at p. 889.) The court reasoned that a defendant should not be compelled to choose between the privilege against self-incrimination at trial and the exercise of the right to be heard at a probation revocation hearing. (*Id.* at p. 878.) To resolve the tension between competing rights, the

19

court created a "judicially declared exclusionary rule" that a probationer's revocation hearing testimony is inadmissible during the prosecution's case-in-chief. The intent of the rule "is to encourage the fullest possible *truthful* disclosure of relevant facts and circumstances at the revocation hearing by allowing a probationer who does testify at his revocation hearing nonetheless to enjoy unimpaired the full protection of the privilege against self-incrimination at his subsequent trial." (*Id.* at p. 892.)

Defendant argues the rule established in *Coleman* has been extended to other contexts to preclude the prosecution's use of a defendant's statements as substantive evidence of guilt when one constitutional right is pitted against another. (See, e.g., *People v. Ledesma* (2006) 39 Cal.4th 641, 691–694 [privileged disclosures in habeas corpus proceeding based on ineffective assistance of counsel did not waive attorney-client privilege for purpose of retrial]; *People v. Knight* (2015) 239 Cal.App.4th 1, 5–8 [statements made in support of motion to substitute appointed counsel are subject to use immunity]; *Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478, 498–503 [statements made during a court-compelled mental examination cannot be used in a subsequent trial]; *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 806–811 [statements made by a minor to a probation officer and during a fitness hearing inadmissible as substantive evidence against minor at trial]; *Simmons v. United States* (1968) 390 U.S. 377, 393–394 [defendant's testimony in support of motion to suppress inadmissible at subsequent criminal trial].) Defendant urges us to adopt the same approach with respect to section 1170.95 evidentiary hearings.

We find defendant's reliance on these authorities unavailing. The Fifth Amendment privilege against self-incrimination protects persons from being compelled by " 'governmental coercion' " to serve as witnesses against

20

themselves in " 'any *criminal case.*' " (*People v. Tom* (2014) 59 Cal.4th 1210, 1222–1223, italics added.) A section 1170.95 hearing, however, " 'is not a trial *de novo* on all the original charges.' [Citation.] Rather, it is a *postconviction* proceeding 'due to the Legislature's inclusion of section 1170.95 in Senate Bill No. 1437 . . . , [as] an 'act of lenity' [citation], allowing for the retroactive application of the new law governing accomplice liability for felony murder [citation] for defendants already serving valid sentences for murder.' " (*Williams, supra,* 57 Cal.App.5th at p. 661, quoting *People v. Wilson, supra,* 53 Cal.App.5th at p. 53; see, e.g., *People v. Anthony, supra,* 32 Cal.App.5th p. 1156 [§ 1170.95 petitioners do not have 6th Amend. trial rights].) Because a sentence modification under section 1170.95 is an act of lenity and not a criminal trial, the wrongful admission of evidence does not implicate defendant's constitutional rights under the Fifth Amendment.

Moreover, the Fifth Amendment protects individuals from government coercion. Here, defendant was not compelled to file a section 1170.95 petition, nor to testify at her parole hearing, nor to participate in her risk assessment interview. Indeed, as the trial court noted and defendant acknowledges, parole cannot be conditioned on admission of guilt to a certain version of the crime. (§ 5011, subd. (b); Cal. Code Regs., tit. 15, § 2236; *In re Swanigan* (2015) 240 Cal.App.4th 1, 14 [parole board cannot rely on fact that inmate insists on his innocence to deny parole]; *In re McDonald* (2010) 189 Cal.App.4th 1008, 1023 ["the express provisions of Penal Code section 5011 and section 2236 of Title 15 of the California Code of Regulations prohibit requiring an admission of guilt as a condition for release on parole"].) Defendant was also expressly advised at her parole hearing that she had the option to not discuss the commitment offense and that choice would not be held against her. Defendant opted instead to discuss it and

21

testified under oath about her role in the crime. Having chosen to be truthful in the assessment interview and testify truthfully at the parole hearing, it is not fundamentally unfair to admit that information during a resentencing proceeding voluntarily initiated by defendant bearing on some of the same issues.

In sum, defendant has not demonstrated that the same principles and rationale underlying the judicially created exclusionary rule formulated in *Coleman* and applicable in criminal trials apply in a section 1170.95 resentencing hearing.

## D. Harmless Error

In any event, assuming the trial court erred in admitting the parole assessment report and transcript of the parole hearing, reversal is not required unless it is reasonably probable defendant would have obtained a more favorable outcome had the evidence been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Epps* (2001) 25 Cal.4th 19, 29 ["the *Watson* test for harmless error applies" to the denial of a right that "is purely a creature of state statutory law"].)

Defendant argues a different result was reasonably probable here because at the time of her plea she did not admit she killed White. Moreover, she argues, while she stipulated that the preliminary hearing transcript provided a factual basis for the plea, that transcript did not rule out the possibility that the prosecution would pursue a natural and probable consequences doctrine theory at trial. Defendant argues White, an adult male, and defendant's children were with her in White's house at or about the time of the homicide, and there is no evidence that she would have been able to conceal White's body alone. "Under these circumstances," defendant contends, "the evidence did not show [defendant] committed the homicide on

her own and/or did not show beyond a reasonable doubt that her culpability for the murder was not based on her aiding and abetting some act committed by the male in the house, the natural and probable consequences of which were murder."

We are not persuaded. First, apart from her admissions in the parole risk assessment report and parole hearing transcript, the prosecution relied on the preliminary hearing transcript, the trial court's findings at the preliminary hearing, the amended complaint, and defendant's plea, which had as its factual basis the preliminary hearing transcript and discovery. Taken together, the documents provide strong circumstantial evidence that defendant acted alone.

At the preliminary hearing, multiple witnesses testified about the circumstances surrounding White's disappearance and defendant's suspicious behavior. At the time of his death, White lived with a housemate, Jaime R.[5] Jaime testified that she saw White at the house on the evening of February 11, 2004, and he appeared in normal health. Before Jaime left the house the following morning, she saw the victim asleep and alive in his bedroom. She locked the front door and left. She never saw or talked to White after that.

When Jaime returned to the house at 8:00 p.m. on February 12, she saw a tan station wagon in the driveway and White's dog tied to the front porch railing, which was "odd." Jaime also noticed neither of the two locks on

---

[5] According to Jaime, she was living with White and working with him to help him finish a book he was writing in lieu of paying rent, though she did pay a portion of the utilities. She had an agreement with White as of February 2004, to stay in his house until a month after his book was ready for publication, possibly in June, at which point her lease would be renegotiated.

the front door were locked, which was very unusual. Inside the house, all the lights were off, the floors had been swept, furniture was moved, the dining table was gone, and defendant was in the house with two children and an adult male. Defendant told Jaime that White left with a lady friend and said he would call Jaime later on that night.

Jaime R. testified defendant moved some of White's belongings out of the house. Defendant moved into White's bedroom, and her children stayed on the couch for the "first few nights," then moved into a third bedroom. She told Jaime that she had an agreement with White to rent the top portion of his house and White would stay in the bottom bedroom.

Defendant also told Jaime not to go in the basement because defendant had a "crazed Rottweiler" down there that they were going to have to put to sleep. When Jaime checked the interior basement door that night, it was locked. Jaime testified she had never seen a key to that door, nor had she ever seen it locked before February 12. She checked it two or three times after that, always finding it locked. Defendant kept telling Jaime she would take care of the dog downstairs but "kept on giving excuses." Defendant never asked Jaime for a key to the basement or told her she needed one. Jaime never heard any barking or scratching coming from the basement.

About four or five days later, Jaime tried to look inside the basement from the window in the exterior basement door. A moment earlier, Jaime saw defendant standing at the bay window in the front of the house. As Jaime was looking into the basement, she "felt a presence" and when she turned, saw defendant standing at the side of the house, facing Jaime, about 10 feet away.

The interior basement door remained locked for five or six days, after which defendant told Jaime she could enter the basement to do her laundry.

24

When Jaime went in the basement, the dryer was running, and the exterior door was closed. The key to the exterior door, which normally hung on a nail or hook inside next to the door and had "always been there," was missing. When Jaime asked defendant about the key, defendant said she had no knowledge of a key to that door.

On February 19, Officer Todd Martin went to White's house to take a missing person's report from defendant. Defendant told Martin that she and White were roommates and she had last seen him on February 12, when he left with his girlfriend and his dog after just having finished writing a book he had been working on for 50 years.

When Officer Kevin Wright came to the White residence on February 25 to follow up on the missing person's investigation, defendant led him through the house. He was not able, however, to access the basement. Officer Wright asked if he could look inside the basement, but defendant told him it was locked and she did not have the key. When he asked her if they could enter the basement from inside the house, she said there was no way to enter the basement from inside and that Jaime R. had the key to the locked basement door. During this visit, Officer Wright also asked defendant about a brown leather couch belonging to White that another witness said was "ratty" and covered in dog hair but had "a lot of sentimental value" to White. Defendant said she "didn't get rid of the couch," told Officer Wright the couch was "right there," and pointed him to a brown *cloth* couch in "fairly good condition."

On March 4, Officer Wright spoke with defendant by phone. He asked her for a copy of the lease she told him she had signed with White. When she brought him the lease, she told him she found the key to the basement in the house, but she also told him that Jaime R. had given her the key. When

25

Wright spoke with defendant again on March 9, she said she had lied to him about White's brown leather couch and admitted she "got rid" of it. She also told Wright she had forged the lease she had given him. She also told him that it is possible to access the basement through the interior door, contradicting what she had told him during his visit on February 25.[6]

At some point, defendant told Officer Wright that she brought a Chow and a Rottweiler with her to White's house, but that the Rottweiler had died. She told him she was afraid the Rottweiler was going to bite her child, so she kept the dog in the basement. She also told him she put the dog in a dumpster in Alameda after it died.

On April 14, 2004, police executed a search warrant on White's house and discovered his body entombed in his basement. The body was found in a cardboard box that had been wrapped in plastic and placed under a utility table. Sheets of particle board were placed around the table, held in place with two-by-four inch boards and screws.

That night, Sergeants Michael Foster and Brock interviewed defendant[7] at the Oakland Police Department. Sergeant Foster also spoke with defendant on a couple of occasions after April 14th, and defendant offered three different versions of how White disappeared.

Initially, defendant told officers that White had left with his girlfriend, "Luna." She told Wright she had found some of White's credit cards and had been paying his bills. Defendant later changed the story and said when she arrived at White's house, she had a key to the house and used it to let herself

---

[6] Officer Wright testified to a number of other contradictory statements made by defendant during his investigation.

[7] Defendant waived her rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

in.  A "woman named Michaela, a woman named Jamie," and a neighbor, Rob, were there.  Michaela told defendant that White had hurt himself and was recuperating.

Just before 4:00 a.m. on April 15, Sergeant Foster interviewed defendant again.  In the meantime, he had spoken with Michaela S. and Jaime R.  During this interview, defendant told Foster about an orgy between White, Michaela, and Jaime, during which White fell down a flight of stairs after Michaela threw something to him.  Defendant drew on a diagram for Sergeant Foster and marked locations in the basement of White's house.  Defendant placed a "B" on the diagram "to indicate where the body was" and "1, 2, 3, 4P" to represent a particle board.  She admitted she had screwed the particle board into the table in the basement behind which White's body was found.

After Foster further interviewed Michaela and Jaime, both of whom denied participating in an orgy, Foster again interviewed defendant around 8:10 a.m. on April 15.[8]  Defendant said that after she arrived at his house on February 12, she got into an argument with White over deposit money she had given him to rent part of his house.  He would not return the money and called her names.  He went upstairs to his room, and she followed, demanding her money back.  She pulled out a dresser drawer and threw it in the bedroom.  White reached for a handgun he had in the room.  They got into a struggle near the top of the stairwell.  Jaime R. appeared and tried to help.  Then "she"[9] and White fell down the stairs to the basement.

Although defendant argues on appeal that others were "in White's house at or about the time of the homicide," the only evidence she cites is

_____

[8] Defendant again waived her *Miranda* rights.

[9] It is unclear whether defendant meant herself or Jaime R.

27

testimony from Jaime R. that when she came home at about 8:00 p.m. on February 12, two children, an adult male, and defendant were in the house.[10] Defendant also argues there was no evidence she would have been able to hide the body by herself, but defendant admitted to Sergeant Foster that she screwed the particle board into the table behind which White's body was found, and there is no evidence in the record that anyone helped her move or hide the body. Moreover, as the trial court recognized in denying the petition, there was no indication in the evidence before the court that anyone else was involved in the murder,[11] nor did the prosecution suggest defendant would be tried on a theory she acted as an aider or abettor.

Taking all of the circumstantial evidence presented at the preliminary hearing, including the extensive evidence regarding defendant's efforts to prevent police and the victim's roommate from entering the basement where White's body was found, her inconsistent and changing stories about his disappearance, her knowledge of the body location and admission she screwed in the particle board that concealed White's body, and her fraudulent use of the victim's credit cards after his death, it is not reasonably probable the trial court would have reached a different result in the absence of defendant's admissions in the parole risk assessment and parole hearing transcript.

---

[10] Sergeant Foster testified that Willie T., the adult male who stayed with defendant at White's house beginning on February 12, told Foster that defendant arrived at White's house first and he (Willie) arrived sometime later in the day on February 12.

[11] Certainly, defendant did not introduce any new evidence, as was her statutory right under section 1170.95, subdivision (d)(3), as to anyone else's involvement.

Second, the natural and probable consequences doctrine presupposes that defendant aided and abetted another principal in the commission of a target crime. (See *People v. Prettyman* (1996) 14 Cal.4th 248, 261–262, superseded in part by Sen. Bill 1437.) Defendant does not identify a target offense on which a natural and probable consequences theory could have been based. Relief is available under section 1170.95 only when the conditions enumerated in the statute apply, including that the "petitioner could not be convicted of first or second degree murder *because of changes to Section 188 or 189 made effective January 1, 2019.*" (§ 1170.95, subd. (a)(3), italics added.) Defendant does not explain how the prosecution could have relied on a natural and probable consequences theory without any evidence showing defendant aided and abetted the perpetration of a target offense.

In sum, because the record does not support a conclusion that the case involved a theory of felony murder or the natural and probable consequences doctrine, any error in admitting evidence that defendant was the actual killer is harmless.

## III. DISPOSITION

The order denying defendant's petition for resentencing is affirmed.

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A161450
*People v. Myles*

Trial Court:        Superior Court of Alameda County

Trial Judge:        Morris Jacobson, Judge

Counsel:

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Rene A. Chacon and Juliet B. Haley, Deputy Attorneys General for Plaintiff and Respondent.